ACCEPTED
01-15-00253-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
6/2/2015 6:50:12 PM
CHRISTOPHER PRINE
CLERK

## NO. 01-15-00253-CV

## IN THE COURT OF APPEALS
## FOR THE FIRST JUDICIAL DISTRICT
## OF TEXAS AT HOUSTON

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
6/2/2015 6:50:12 PM
CHRISTOPHER A. PRINE
Clerk

## IN THE INTEREST OF K.M.-J. and D.A.R.-J., CHILDREN

### H.J.-A., Appellant

### v.

## TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES,
### Appellee

### On Appeal from the 314th District Court
### Harris County, Texas
### Trial Court Cause No. 2012-06289J

## ORIGINAL BRIEF OF APPELLANT H.J.-A.

**WILLIAM M. THURSLAND**
**TBN 20016200**
**440 Louisiana St., Ste. 1130**
**Houston, TX 77002**
**713-655-0200 x 105; Fax: (713) 655-9035**
**Email: wmthursland@hotmail.com**

**ATTORNEY FOR APPELLANT**

**ORAL ARGUMENT IS REQUESTED**
**[IF DEEMED NECESSARY]**

## IDENTIFICATION OF PARTIES AND COUNSEL

Appellant herein states that the names of all parties and counsel to this appeal are:

H.J.-A, Appellant:

| At Trial | On Appeal: |
|---|---|
| Kevin H. George | William M. Thursland |
| Attorney At Law | Attorney At Law |
| TBN: 07805850 | TBN: 20016200 |
| 440 Louisiana St., Ste. 1130 | 440 Louisiana St., Ste. 1130 |
| Houston, TX 77002 | Houston, TX 77002 |
| Tel: 713-655-0200 x 107 | Tel: 713-655-0200 x 105 |
| Fax: 713-9655-9035 | Fax: 713-655-9035 |

The Texas Department of Family and Protective Services, Appellee:

| At Trial: | On Appeal: |
|---|---|
| Marc Ritter | Sandra D. Hachem |
| Assistant County Attorney | Sr. Assistant Harris County Attorney |
| TBN: 16951500 | TBN: 08620460 |
| 1019 Congress, 15th Fl | 1019 Congress, 15th Fl |
| Houston, TX 77002 | Houston, TX 77002 |
| Tel: 713-274-5220 | Tel: 713-274-5293 |
| Fax: 713-437-4700 | Fax: 713-437-4700 |

K.M.-J. and D.A.R-J., Children at Trial:

Michelle E. Bush
Attorney at Law
TBN: 24036295
14027 Memorial Dr., Ste. 105, Houston, TX 77079
Tel: 281-460-8486 Fax: 713-531-5451

J.M.-M, Alleged Father at Trial

J.B. Bobbitt
Attorney at Law
TBN: 24078237
405 Main, Ste, 620
Houston, TX  77002
Tel: 713-529-6234;
Fax: 713-802-0688

J.A.R.-E., Alleged Father at Trial

Dan J. Spjut
Attorney At Law
TBN: 24004933
405 Main, Ste, 620
Houston, TX  77002
Tel: 713-225-6800
Fax: 281-476-7857

## REQUEST FOR ORAL ARGUMENT

Appellant requests oral argument if deemed necessary.

## RECORD REFERENCES

Clerk's Record**:**

The Clerk's Record consists of one (1) volume and is referred to herein as CR followed by the page number(s).

Reporter's Record**:**

The court reporter's record consists of four (4) volumes.  The trial testimony is found in the second and third volumes and is referred to as (RR 1) or (RR 2) followed by the page and line number(s).  The exhibits are found in the forth volume and are identified by the offering party and exhibit number.

Statutory Citation References:

Unless otherwise indicated, all statutory references made herein refer to the Texas Family Code.

## TABLE OF CONTENTS

IDENTIFICATION OF PARTIES AND COUNSEL                              i

REQUEST FOR ORAL ARGUMENT                                         ii

RECORD REFERENCES                                                ii

TABLE OF CONTENTS ii

TABLE OF AUTHORITIES iv

STATEMENT OF THE CASE 1

ISSUES PRESENTED 2

ISSUE ONE:    DID THE TRIAL COURT ABUSE ITS DISCETION BY
ADMITTING INTO EVIDENCE DFPS EXHIBIT NO. 17
WHICH CONTAINED OPINIONS OF EXPERTS THAT
WERE NEVER DISCLOSED IN RESPONSE TO A
TIMELY  SERVED REQUEST UNDER TRCP 194.2(f)

ISSUE TWO:    WAS THE EVIDENCE LEGALLY AND FACTUALLY
SUFFICIENT TO SUPPORT THE TERMINATION
FINDING UNDER §161.001(1)(D) and (E)

ISSUE THREE:   WAS THE EVIDENCE LEGALLY AND FACTUALLY
SUFFICIENT TO SUPPORT THE BEST INTEREST
TERMINATION  FINDING


STATEMENT OF FACTS 3

SUMMARY OF ARGUMENT 13

ARGUMENT: Standard of Review 16

ISSUE ONE: Authorities & Argument: 18

ISSUE TWO: Authorities & Argument: 26

ISSUE THREE: Authorities & Argument: 37

PRAYER 44

CERTIFICTE OF COMPLIANCE 44

CERTIFICATE OF SERVICE                                               46

## TABLE OF AUTHORITIES

### Federal Cases

*Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388 (1982)           16

### State Cases

*Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238 (Tex. 1985)   19

*Holick v. Smith*, 685 S.W.2d 18 (Tex. 1985)                         16

*Holley v. Adams,* 544 S.W.2d 367 (Tex. 1976)                        38

*Clark v. Dearen*, 715 S.W.2d 364 (Tex. App. - Houston [1st Dist.]   38
1986, no writ)

*Avery v. State*, 963 S.W.2d 550 (Tex. App. – Houston [1st Dist.]    29
1997, no writ)

*In re A.A.A..*, 265 S.W.3d 507 (Tex. App. - Houston [1st Dist.]     40
2008, pet. denied)

*In re A.C.,* 394 S.W.3d 633 (Tex. App. - Houston [1st Dist.]        40
2012, no pet.)

*In re A.S.*, 261 S.W.3d 76 (Tex. App. - Houston [14th Dist.]        27
2008, pet. denied)

*In re C.H.,* 89 S.W.3d 17 (Tex. 2002)                               38

*In re C.L.C.,* 119 S.W.3d 382 (Tex. App. – Tyler 2003, no pet.)     28

*In re E.C.R.,* 402 S.W.3d 239 (Tex. 2013)                           39, 41

*In re E.N.C.* 384 S.W.3d 796 (Tex. 2012)                            29, 37, 39

*In re G.M.G.*, 444 S.W.3d 46 (Tex. App. – Houston [14th Dist.]      39
2014 no pet.)

*In re J.F.C.*, 96 S.W.3d 256  (Tex. 2002)      16, 17

*In re J.L.*, 163 S.W.3d 79  (Tex. 2002)      18

*In re J.R.*, 171 S.W.3d 558 (Tex. App. – Houston
[14th Dist.] 2005, no pet.)      28

*In re J.T.G.*, 121 S.W.3d 117 (Tex. App. – Ft. Worth 2003
no pet.)      26

*In re J.W.*, 152 S.W.3d 200  (Tex. 2006)      28

*In re R.R.*, 209 S.W.3d 112 (Tex. 2006)      37

*In re T.G.R.-M.,* 404 S.W.3d 7 (Tex. App. - Houston [1st Dist.]
2013, no pet.)      26

*Jordan v. Dorsey,* 325 S.W.3d 700 (Tex. App. - Houston [1st Dist.]
2010, pet. denied)      28

*Texas Dept. Human Servs. v. Boyd*, 727 S.W.2d 531 (Tex. 1987)      27

*Vingeard A.S. v. Merrimac Hospitality Systems, Inc*. (Tex.
App. – Ft. Worth 2001, pet. denied)      22

*Yonko v. DFPS.,*196 S.W.3d 236 (Tex. App. - Houston [1st Dist.]
2006, no pet.)      40

*Wigfall v. TDCJ.,*137 S.W.3d 268 (Tex. App. – Houston [1st Dist.]
2004, no pet.)      19

## Statutes

Tex. Family Code Ann. § 161.001(1)      18

Tex. Family Code Ann. § 161.001(1)(D)      26

Tex. Family Code Ann. § 161.001(1)(E)      26

Tex. Family Code Ann. § 161.001(1)(O)      12, 17

Tex. Family Code Ann. § 161.001(2)        18, 26, 37

Tex. Family Code Ann. § 263.307(a)        39

Tex. Family Code Ann. § 263.307(b)        39

Tex. R. App. Pro. 44.1(a)(1)        24

Tex. R. Civ. Pro. 193.5(a)        18

Tex. R. Civ. Pro. 193.5(b)        19

Tex. R. Civ. Pro. 193.6(a)        23, 24

Tex. R. Civ. Pro. 193.6(b)        19, 23

Tex. R. Civ. Pro. 194.2(f)        18, 22, 23

NO. 01-15-00253-CV

_____

IN THE COURT OF APPEALS
FOR THE FIRST JUDICIAL DISTRICT
OF TEXAS AT HOUSTON

_____

IN THE INTEREST OF K.M.-J. and D.A.R.-J., CHILDREN

_____

H.J.-A., Appellant

v.

TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES,
Appellee

_____

On Appeal from the 314th District Court
Harris County, Texas
Trial Court Cause No. 2012-06289J

_____

TO THE HONORABLE JUSTICES OF THE COURT OF APPEALS:

Appellant, H.J.-A., (also referred to as "mother"), respectfully submits her brief in the above styled and number appeal.

STATEMENT OF THE CASE

On November 7, 2012, the Texas Department of Family and Protective Services ("DFPS") filed its *Original Petition for Protection of a Child, for Conservatorship and Termination In Suit Affecting The Parent-Child Relationship and Order Setting Hearing* wherein it requested, inter alia., to be named the

1

temporary managing conservator of the following K.M.-J., a female born on March 5, 2010 and D.A.R.-J., a male born on December 13, 2011. (CR 5-29) At the adversary hearing held on November 20, 2012, DFPS was appointed as the children's sole temporary managing conservator. (CR 32-38)

The case was tried before the Honorable John Phillips on January 30, 2014 and October 7, 2014. The trial court found the evidence sufficient to terminate appellant's parental rights under §161.001(1)(D) and (E). It also found that termination of her rights was in the children's best interest.[1] (CR 186-195)

The court appointed appellate counsel for H,J.-A. and on March 13, 2015 she filed her notice of appeal. (CR 107-108)

### ISSUES PRESENTED

ISSUE ONE: DID THE TRIAL COURT ABUSE ITS DISCETION BY ADMITTING INTO EVIDENCE DFPS EXHIBIT NO. 17 WHICH CONTAINED OPINIONS OF EXPERTS THAT WERE NEVER DISCLOSED IN RESPONSE TO A TIMELY SERVED REQUEST UNDER TRCP 194.2(f)

ISSUE TWO: WAS THE EVIDENCE LEGALLY AND FACTUALLY SUFFICIENT TO SUPPORT THE TERMINATION FINDING UNDER §161.001(1)(D) and (E)

---

[1] The parental rights of the alleged fathers, J.A.R.-E. and J.M.-M., were also terminated and they have not appealed.

ISSUE THREE:   WAS THE EVIDENCE LEGALLY AND FACTUALLY
              SUFFICIENT TO SUPPORT THE BEST INTEREST
              TERMINATION  FINDING

STATEMENT OF FACTS

The bench trial commenced on January 30, 2014.  Mother was present with her attorney.  The alleged father, J.A.R.-E., was present without counsel.  DFPS trial counsel asked the court to "start this trial and recess" because "I have a problem with my doctor witness that was supposed to be available and that's my primary problem."  Mother objected because she had served disclosure requests on DFPS and it failed to identify any of its individual witnesses and experts.  The objection was summarily overruled.  She then moved for a continuance but before her counsel could articulate the basis for her request the motion was denied.  (RR 1; p. 5-8)

DFPS called the custodian of records for Texas Children's Hospital ("TCH") and offered its records into evidence as DFPS #17.  Mother objected again because it was "recently" provided to her counsel and "it contains opinions from doctors that were not identified in response to my disclosure request."  Mother's objection was again summarily overruled and the exhibit was admitted.  (RR 1; p. 9-10)

*Mother:*

H.J.-A. testified she is the mother of the children.  She was present in the

3

house when her son Jonathan was injured. She called the ambulance because her son was complaining that he hurt "here (indicating)." The DFPS worker later told her he died because "he was hit in the stomach." She never personally saw "any injury or any assault upon her son." (RR 1 p. 11-13)

Jonathan was three years old at the time he was injured and not very tall. He could easily be picked up and carried around the apartment. K.M.-J. was "close to 2" and D.A.R.-J. was "not quite 1." She and J.A.R.-E.[2] lived with the children in a one-bedroom apartment. The children slept in the bedroom and the parents in the den. She took care of the children while he worked. (RR 1 p.14-15; L. 1-19)

On the day the injury occurred mother took all three children to the park. Jonathan fell and scratched his eye. After she cleaned his eye the children continued to play and they stayed at the park the rest of the day. J.A.R.-E. returned from work at about 9:00 or 10:00 pm. She agreed he left and "hung out with his brother awhile." When he returned home and watched television. The children had already eaten and were in bed. (RR 1 p. 15; L. 22-25, p. 16 & p. 17; L. 1-3)

Mother agreed she told the detective and the DFPS caseworker that she saw her "boyfriend play boxing with [their] 3-year-old son." However, she said that

---

[2] J.A.R.-E. is referred to as "boyfriend" and "father." He admitted to being the father of both children. Yet he was never established to be their father despite DNA testing having been ordered.

because she "felt completely pressured to see my son laying . . . down there dead." When she put the three children to bed that night Jonathan was "fine . . . [h]e went to bed in a normal way like any other child." J.A.R.-E went to the bathroom and saw Jonathan was "cold." Appellant called the ambulance because he said he "hurt . . . and touched himself here (indicating)." She told the ambulance service to hurry up because her son was dying but they said there was not an ambulance available for where she lived. He was pronounced dead at the hospital. (RR 1 p. 17; L. 4-25 & p. 18-19)

Appellant agreed she was told that Jonathan died because his "intestines literally exploded inside his body." She again stated he was fine when he went to sleep but agreed, "he woke up seven hours later moaning" and "only said he hurt here." (RR 1 p. 20)

H.J.-A. has three children. She and J.A.R.-E have no criminal or CPS history. She never saw him being violent with the children or physically discipline Jonathan. She confirmed that "everything was normal" with Jonathan that day. That morning he was relaxed, laughing and playing with his siblings. They returned home for lunch. Jonathan ate a normal ration of fruit and rice. Mother then bathed all three children and he did not show any pain or discomfort. They then watched a movie and later they "all ate normally." (RR 1 p. 22-23 & p. 24;

5

L. 1-2)

After dinner appellant brought them to the bedroom where they sleep. She did not notice any pain or discomfort with Jonathan. The father came home around 9:00 pm when the children were sleeping. They stayed up until about 11:00 pm. She went to the bathroom at about 3:00 or 4:00 and checked on Jonathan who was awake. He told her "he hurt here (indicating)." She then woke up J.A.R.-E and called the ambulance. The first person did not speak Spanish who had difficulty understanding her. About 15 or 16 minutes later the ambulance arrived. (RR 1 p. 24; L. 3-25 & p. 25)

Mother has no personal knowledge as to Jonathan's cause of death. Her information was derived from the investigator and caseworker. She agreed again that she told the police officer and on another occasion the investigator that she saw father "play boxing with the child." Yet that statement was not true. She felt pressured to make an inconsistent statement because "at that very day when I was seeing my child dead, I didn't know what to say because [a detective] told me that if I didn't see anything I was going to be put in jail."[3] (RR 1 p. 26)

---

[3] Appellant further explained she felt pressure to say something because the detective was telling her if she did not help she could go to jail. She did not want to "go to jail because [she] did nothing. (RR 1 p. 26; L. 24-15 & p. 27; L. 1-5)

H.J.-A. loves her children very much and only missed two visits because she did not have the money to pay for a taxi. She has no idea what caused Jonathan to die and never saw the "father in any way being physically violent with [him]." (RR 1 p. 27)

When asked by the trial court asked if she felt pressured to say that she saw J.A.R.-E. play boxing with Jonathan when she was in court last year, appellant answered, "I was afraid . . .to go to jail for something that I haven't done." She said it was the J.A.T.-E. rather than another person because she "didn't even know what to say" and it "was the only thing that occurred to [her]." (RR 1 p. 28-29)

J.M.-M. is K.M.-J.'s father and J.A.R.-E. is D.A.R.-J.'s father. Appellant was married to J.M.-M. but he was deported because she brought a domestic violence charge against him in January 2010. (RR 1 p. 30 & p. 31; L. 1-10)

On re-cross, the children's attorney ad litem ("ad litem") asked a series of questions regarding the condition of Jonathan's body at the hospital. Appellant objected because her questions assumed facts not in evidence. The objection was overruled and counsel's request for a running objection was granted. The first question assumed there were "older bruises." Mother responded he was born "with purple marks back there." The ad litem then claimed the bruises were on her "baby's legs from a belt or an extension cord." Appellant explained she left her

7

children with a friend who has older children because she was going to begin a new job the next day.  On that day they were playing with sticks.   (RR 1 p. 31; L. 15-25 & p. 32-33)

Mother then offered DFPS' responses to her disclosure request, which was admitted. (RR 1 p. 34; L. 20-25 & p. 35) (Mother's #1)

Trial resumed on October 7, 2014.  Before eliciting testimony, DFPS offered the following relevant exhibits that were admitted into evidence without objection:

DFPS #8  -  The removal affidavit.

DFPS #9  -  The temporary orders following adversary hearing.

DFPS #10 -  The status hearing order.

DFPS #11 - Appellant's Family Service Plan ("FSP")

DFPS #15  -  Autopsy report from Harris County Institute for Forensic Science.

DFPS #16 -   J.A.R.-E.'s criminal records that contain the indictment and charge with the probable cause affidavit in cause no. 1367221 wherein J.A.R.-E. is accused of causing Jonathan's death.  Also is a judgment that reflects he was convicted of the class B misdemeanor offense of driving while intoxicated on August 12, 2009 and received a sentence of 37 days in the Harris County Jail.

DFPS #19 -  Photographs of the decedent child Jonathan.

(RR 2 p. 7-8)

*Father, J.A.R.-E.*

J.A.R.-E. admitted he is the father of K.M.-J. and D.A.R.-J. He was aware that a child died in his home. When asked, "what happened that night" and "were all the children fine at 9:00 o'clock the night before the child passed away," he invoked he right against self-incrimination. (RR 2 p. 9-10)

*Archield – DFPS Caseworker*:

The DFPS caseworker, Casey Archield ("Archield"), testified K.M.-J. is four and D.A.R.-J. is two. They are in a foster home that is meeting all their physical and emotional needs. She opined it is in their best interest to terminate "the parental rights" because "there was . . . a child's death fatality on the case." She did not review any medical records. She believes the children are adoptable. (RR 2 p. 13-14; L. 1-19)

Although Archield stated the children have no current needs, K.M.-J. "hears voices and a baby crying continuously in her head." At the end of August "a psychological" was done but the results were still pending at the time of trial. The foster home is not willing to adopt and a "legal broadcast" has been done. DFPS looked at family members, including a grandmother in California, but no family members "have worked out for placement." (RR 2 p. 14; L. 14-25 & p. 15)

9

Archield has no "first hand knowledge of the facts of removal" or that

J.A.R.-E. harmed the children. (RR 2 p. 17) Nevertheless, DFPS was seeking to

terminate his parental rights because he stated "he caused the injuries to the child"

and "he is in jail for the injuries of the child." Her knowledge was based on the

interview he gave to the police officer. (RR 2 p. 19-20)

Mother completed all the requirements of her FSP. The purpose of the FSP

is "to try to cure all the risks" that caused the child to be brought into care and

eliminate future risk. Archield could not opine on whether mother would be "a

future risk to the children." She agreed with the trial court "she ain't been around

long enough." (RR 2 p. 21-22)

Archield observed mother interact with her children and agreed they are well

bonded and love each other. In that area, she is meeting their "physical and

emotional needs." The children have been in foster care since 2012 and "there's

been no permanency on these kids." If mother's rights are terminate "[w]e don't

know where these kids are gonna end up." Appellant is employed and has a home.

However Archield has not seen the home. (RR 2 p. 23-24)

In October 2013 DFPS had a primary goal of relative adoption and

concurrent goal of reunification with the mother. Nothing "factually" has changed

since that date to cause the agency to change its goal. Based on what she heard

from others, Archield believes H.J.-A. endangered the children. She tried to learn what K.M.-J.'s desires are but the child only speaks Spanish and "she's kind of all over the place as far as not really responding." She did not speak to anyone at DFPS to learn what the children might have told them regarding their desires. Archield agreed mother "wants these kids back with her" and "she's done everything to have that goal accomplished." However, the therapist told her "today" that H.J.-A. did not go to as many sessions as she would like. Yet this happened because DFPS did not provide the "2054's." (RR 2 p. 24; L. 25 & p. 25-26)

*Closing Arguments*:

DFPS asked that mother's parental rights be terminated on (D) and (E) grounds because "case law says that if there's only two . . . people in the home and neither one of them can verify how the injuries occurred, it's imputed to both of them." The court was skeptical and noted, "I haven't seen any case law that says that." It then distinguished this case from a First Court of Appeals case styled: *In re B.R. and I.R., a child*, because in the later case an "expert witness that testified that there's only one way the injuries could have occurred that results in the [child's] death." In response, DFPS argued, the "autopsy report shows the child died from blunt force trauma" and mother did not seek treatment for K.M.-J.'s

11

"broken ankle for more than a month." Counsel specifically referred to DFPS #17. (RR 2 p. 28-29, p. 31; L. 8-10 & p. 33; L. 1-6)

Appellant argued that although the autopsy report reflects Jonathan died as a result of blunt force trauma, whether it was cause by a fall or a punch is unclear. She noted that there was no damage to other organs and "that blunt force had to have a pinpoint accuracy like a cruise missile without collateral damage." (RR 2 p. 34-35)

H.J.-A. argued against terminating her parental rights on best interest grounds by observing she did "everything possible to rehabilitate herself;" she visited her children; they and mother are bonded; and ,DFPS has not found "any permanent placement." (RR 2 p. 37)

The ad litem requested that appellant's parental rights be terminated because she "didn't do anything once the play boxing death hit came and then the child died." She also noted that the autopsy report found "old looped bruises on [Jonathan's] legs."[4]      (RR 2 p. 38)

Before rendering its verdict the trial court observed:

---

[4] This information is found in the removal affidavit and provided by a TCH nurse not the autopsy report that describes certain finding "curvilinear abrasions" on the "sternoclavicular junction" and "anterior distal right thigh." It never uses the term "looped" or opines as to when or how the abrasions occurred. (DFPS #8) & (DFPS #15, p. 4)

"Now other thing that I think . . . is that in the medical records, although you didn't have an expert witness testify, the medical records that have been admitted on [K.M.-J.] has a statement by the physician that says, patient has clear injury apparent to anyone and medical treatment was not obtained. This is consistent with abuse and neglect." The court then terminated mother's rights "under 161.001(D) and (E)." (RR 2 p. 40; L. 16-23 & p. 42; L. 18-19)

## SUMMARY OF ARGUMENT

The first witness DFPS called was the TCH custodian of records. Mother objected to the admission of these medical records that pertain to K.M.-J. because it was "recently" provided to her counsel and "it contains opinions from doctors that were not identified in response to my disclosure request." Her objection was overruled and the records were admitted. (DFPS #17) (RR 1; p. 9-10)

In response to appellant's disclosure request DFPS identified only Dr. Girardet who was never called as a witness and never treated K.M.-J. The subject exhibit contained opinions of Dr. Louis, a pediatrician, and Dr. Seghers, a radiologist. TRCP 193.6(a) provides that a party that fails to amend or supplement an inaccurate response "may not introduce in evidence the material or information that was not timely disclosed." It is undisputed that DFPS never attempted to amend or supplement its response.

13

The burden then shifts to DFPS to establish good cause for its failure to timely supplement its response; or show lack of unfair surprise or unfair prejudice to the other party. In the instant case there was no attempt much less proof to establish one of the exceptions under TRCP 193.6(a).

Appellant must further show that the admitted evidence probably caused an improper judgment. The trial court's comments during closing arguments clearly demonstrate that it gave a great deal of weigh to Dr. Louis's opinion. It observed, ". . . in the medical records [DFPS#17], although you didn't have an expert witness testify, the medical records that have been admitted on [K.M.-J.] has a statement by the physician that says, patient has clear injury apparent to anyone and medical treatment was not obtained. This is consistent with abuse and neglect."

The fact that a parent abused or neglect another child is a factor that a reviewing court can consider in determining if the evidence is sufficient to support the endangerment as well as best interest findings.

If the prejudicial evidence contained in DFPS #17 is not admissible, as argued above, then the remaining evidence is insufficient to support either of the endangerment findings. Specifically, with regard to the subsection (E) finding, the evidence does not show that mother engaged in a conscious, intentional course of conduct that endangered her children. The removal affidavit reveals that when

14

they were first examined by DFPS there were no observable signs of injury. They came into care because their father, J.A.R-E., struck their half sibling, Jonathan, in the abdomen with such force that it caused his death. Neither he nor appellant had any CPS history. His criminal history consisted of one misdemeanor conviction in 2009 for driving while intoxicated. Mother has no criminal history. Moreover, there is no history of drug use or domestic violence.

Although there was evidence of bruising on Jonathan's body, there was no proof of how they occurred or if they were consistent with physical abuse. No medical expert testified at trial.

Finally, mother also argues that the weight of the evidence does not support the best interest termination finding. While the evidence relating to the *Holly* factors was minimal what little there was supports maintain the parent-child relationship. It is undisputed that mother completed all the services set forth in her FSP. She and her children are bonded. There was no evidence that they were bonded to any other adult despite being in DFPS custody for nearly two years. They were not in an adoptive home and none had been found at the time of trial.

On the face of this record, DFPS simply did not present enough evidence to support the best interest finding. Moreover, when the paltry proof that supports the finding is compared with the compelling proof that weights against it, no

15

reasonable fact finder could form a firm belief or conviction that termination of the mother's parental rights is in the children's best interest.

Standard of Review:

The involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. Appellate courts strictly scrutinize termination proceedings and involuntary termination statutes are strictly construed in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20-21 (Tex. 1985) The natural right existing between a parent and a child is of such a degree as to be of constitutional dimensions. *Santosky v. Kramer*, 455 U.S. 745, 758-759, 102 S. Ct. 1388, 1397-98 (1982)

Due to the severity and permanency of the termination of parental rights the burden of proof is heightened to the clear and convincing evidence standard. *In re J.F.C.*, 96 S.W.3d 256, 265-266 (Tex. 2002) The clear and convincing standard requires "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."

In conducting a legal sufficiency review the reviewing court considers all the

16

evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a reasonable belief that its finding was true. It assumes the fact finder resolved disputed facts in favor of its findings if a reasonable fact finder could do so. The court should disregard all evidence that a reasonable fact finder could have disbelieved or found incredible. It should not, however, disregard all evidence that does not support the finding because doing so could skew the analysis of whether there is clear and convincing evidence. If the court determines that a reasonable fact finder could not form a firm belief or conviction that the allegations were true, then it must conclude that the evidence is legally insufficient. *Id.* at 266

Under a factual sufficiency review the court considers all the evidence equally, both disputed and undisputed, to determine if the disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. If in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not have reasonably formed a firm belief or conviction, then the evidence is factually insufficient. *Id.* at 266

The State bears the burden of proving by clear and convincing evidence the following: (1) that the parent committed one or more of the acts or omissions

17

specifically listed under §161.001(1); and (2) termination of the parent's rights is in the child's best interest. §161.001(2); *In re J.L.*, 163 S.W.3d at 84

ISSUE ONE:        DID THE TRIAL COURT ABUSE ITS DISCETION BY ADMITTING INTO EVIDENCE DFPS EXHIBIT NO. 17 WHICH CONTAINED OPINIONS OF EXPERTS THAT WERE NEVER DISCLOSED IN RESPONSE TO A TIMELY SERVED REQUEST UNDER TRCP 194.2(f)

Applicable Legal Standard

TRCP 194.2(f) provides that a party may request disclosure for any testifying expert of:

(1) the expert's name, address, and telephone number;

(2)  the subject matter on which the expert will testify;

(3) the general substance of the expert's mental impressions and opinions and a brief summary of the basis for them, or if the expert is not retained by by, employed by, or otherwise subject to the responding party, documents reflecting such information.

TRCP 193.5(a) provides that if a party discovers its responses to written discovery are incomplete it must amend or supplement its responses "to the extent that the written discovery sought the identification of persons with knowledge of relevant facts, trial witnesses, or expert witness." The supplemental response must be made reasonably promptly after the party discovers the necessity for such a response.  It is presumed that a supplemental response made less than 30 days

18

before trial was not made reasonably promptly. TRCP 193.5(b)

TRCP 193.6(a) provides that a party that fails to supplement a response in a timely manner "may not introduce in evidence the material or information that was not timely disclosed, or offer the testimony of a witness who was not timely identified," unless the court finds that:

(1) there was good cause for the failure to timely supplement; or

(2) the failure to timely supplement the discovery response will not unfairly surprise or unfairly prejudice the other party.

The burden of establishing good cause or lack of unfair surprise or unfair prejudice is on the party seeking to introduce the evidence or call the witness. TRCP 193.6(b)

A trial court's decision regarding discovery matters is reviewed under an abuse of discretion standard. *Wigfall v. TDCJ*, 137 S.W.3d 268, 272 (Tex. App. – Houston [1st Dist.] 2004 no pet.) A trial court abuses it discretion if it acts without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985)

<u>Relevant Evidence:</u>

DFPS counsel moved the court to "start this trial and recess" because "I have a problem with my doctor witness that was supposed to be available and that's my

primary problem."

Mother objected because DFPS had failed to identify any of its individual witnesses and experts in response to her timely disclosure request. The objection was summarily overruled. She then orally moved for a continuance but before her counsel could articulate the reasons supporting her request, it was denied. (RR 1; p. 5-8)

DFPS then called the TCH custodian of records to testify and the following exchange occurred:

Q. And you are the custodian of records for [TCH]?

A. Yes.

Q. Did you bring some records with you today?

A. Yes.

Q. And can you hand me those records?

A. You can keep that.

Mr. Ritter: Judge, I can go through the process, but I want to offer these right now as Petitioner's Exhibit 16 –17 . . . "

Mr. George: Judge, I object to Exhibit 17 on the basis that this document has just been recently provided to me and it contains opinions from doctor that were not identified in response to my disclosure request.

Mother's objection was again summarily overruled and the exhibit was

admitted.  (RR 1; p. 9-10)

DFPS served its discovery responses on October 22, 2013.  In response to TRCP 194.2(f), it identified only one testifying expert from TCH, Dr. Rebecca Girardet.  The subject matter of her testimony was described as "[m]edical findings and recommendations for the child based on medical facts, the family history, and background of the child(ren) and/or parent(s).  Under the heading "mental impressions/basis" it stated the "best interests of the child(ren) based on observations of the child; and the family, case and medical history . . . and the behaviors and needs of the child(ren).  (Mother's #1 p. 172)

DFPS #17 relates to treatment and examinations K.M.-J. received at TCH after she came into DFPS care.  In particular, it contained a "Physician's Statement Regarding Injury to a Child" dated November 7, 2012 wherein Penelope Louis, M.D. ("Dr. Louis") wrote: "there are multiple injuries without explanation . . . [i]njuries different ages. The patient has clear injury apparent to anyone and medical treatment not obtained.  This is consistent [with] abuse & neglect." (DFPS #17 p. 153)

This exhibit also contains the opinion of a radiologist named Victor J. Seghers.  He interpreted K.M.-J.'s XR skeletal survey and concluded:

The presence of metaphyseal corner fracture of the distal right tibia in addition to the extensive callus formation involving much of the right tibia and

fibula and history of nonaccidental trauma involving a sibling raises concern for nonaccidental trauma of this child. (DFPS # 17, p.117)

At closing DFPS supported its request to terminate mother's parental rights on endangerment grounds by arguing the "autopsy report shows the child died from blunt force trauma" and mother did not seek treatment for K.M.-J.'s "broken ankle for more than a month." Counsel specifically referred to DFPS #17. (RR 2 p. 33; L. 1-6)

Similarly, when the trial court found that appellant's rights should be terminated under subsections (D) and (E), it expressly referred to DFPS #17 by observing, "although you didn't have an expert witness testify, the medical records that have been admitted on [K.M.-J.] has a statement by the physician that says, patient has clear injury apparent to anyone and medical treatment was not obtained. This is consistent with abuse and neglect." (RR 2 p. 40; L. 16-23)

Analysis & Argument:

In this case, DFPS wholly failed to disclose the information it was required to provide under TRCP 194(f)(1)(2) & (3). Thus, this is not a dispute over whether the required disclosures were timely made. Here DFPS simply never even bothered to supplement or amend its response. See *Vingcard A.S. v. Merrimac Hospitality Systems, Inc.*, 59 S.W.3d 847, 854-855, 857 (Tex. App. – Ft. Worth 2001, pet.

22

denied)(trial court erred by permitting an expert to testify whose opinions were not disclosed in compliance with TRCP 194.2(f) and opposing party objected at trial)

While the record is not clear as to exactly when DFPS discovered its response to mother's TRCP 194.2(f) request was inaccurate, it is clear their response was never supplemented or amended. The penalty for failing to amend or supplement discovery responses is equally clear. TRCP 193.6(a) provides that a party that fails to amend or supplement a response in a timely manner "may not introduce in evidence the material or information that was not timely disclosed, or offer the testimony of a witness who was not timely identified."

Moreover, DFPS had the burden of establishing good cause for its failure; or showing a lack of unfair surprise or unfair prejudice to the other party. TRCP 193.6(b) Here it merely asked the Judge to start and stop the trial because of an undisclosed "problem" with an unnamed "doctor witness that was supposed to be available." DFPS not only failed to explain what attempts it had made to obtain the doctor's testimony but it made no attempt to explain why it failed to amend or supplement its TRCP 194.2(f) response.

Even if a party fails to meet its burden under TRCP 193.6(b), the court may grant a continuance or temporarily postpone the trial to allow a response to be amended or supplemented. TRCP 193.6(c) In the instant case, it was actually

23

appellant and not DFPS, the party seeking to introduce the non-disclosed expert evidence, that requested the continuance.

In sum, there was no attempt – much less any evidence offered – to establish that DFPS's failure was excused under TRCP 193.6(a)(1) or (2). In the total absence of any such evidence, the trial court's implied finding that DFPS's failure to amend or supplement its response was excused can only be characterized as arbitrary and unreasonable. Therefore, the court abused its discretion by admitting DFPS #17.

In order to constitute reversible error, however, the trial court's error in the admission or exclusion of evidence must have probably caused an improper judgment. TRAP 44.1(a)(1)

The record indisputably shows that the fact finder gave a high level of credibility to Dr. Louis' opinion. DFPS supported its request to terminate mother's parental rights on endangerment grounds by citing K.M.-J.'s medical records, "they also show that K.M.-J. suffered from a - - - effectively a broken ankle and that Mom did not seek out treatment for that broken ankle for more than a month."

The court however retorted that it had "read the reports from K.M.-J." and there was "no statement to that effect." The court noted it "was pretty much this is what the x-rays show. So I mean if you can show me where I'm wrong about that,

24

I'll look at it."  (RR 2 p. 29-30)

The court correctly noted that K.M.-J.'s XR skeletal survey, by itself, was inconclusive as to whether the child's injury was caused by nonaccidenal trauma or neglect, it merely stated the healing fractures together the "history of nonaccidental trauma involving a sibling raises concern for nonaccidental trauma of this child." (DFPS # 17, p.117)

In fact, the x-rays were taken on November 5, 2012, revealed the right tibia and fibula fracture was healed.  The records refer to a "faint fracture line visible at the right distal fibula;" and noted that K.M.-J. "can ambulate without any indication of pain."  She did not need "any form of immobilization at this time since her fracture appear (sic) to be healed."  (DFPS # 17, p.112)

There is no evidence in DFPS #17 to show that the radiologist concluded, as had DFPS, that mother waited "more than a month before she sought treatment [for K.M.-J.]" (RR 2 p. 33; L. 5-6)

Nevertheless, at a later point during closing arguments, the court found Dr. Louis' statement wherein she wrote: "there are multiple injuries without explanation . . .  [i]njuries different ages. The patient has clear injury apparent to anyone and medical treatment not obtained.  This is consistent [with] abuse & neglect." (DFPS #17 p. 153)

The weight the court gave to Dr. Louis' opinion is amply illustrated by the following remark:

"Now other thing that I think . . . is that in the medical records, although you didn't have an expert witness testify, the medical records that have been admitted on [K.M.-J.] has a statement by the physician that says, patient has clear injury apparent to anyone and medical treatment was not obtained.  This is consistent with abuse and neglect." (RR 2 p. 40; L. 16-23)

Evidence as to how a parent treated another child is relevant regarding whether a course of endangering conduct has been established. *In re: T.G.R.-M.*, 404 S.W.3d 7, 14 (Tex. App. – Houston [1st Dist.] 2013, no pet.)

In conclusion, the court improperly admitted DFPS #17 into evidence.  This error probably caused an improper judgment because the fact finder gave great weight to Dr. Louis' report that opined K.M.-J. suffered from abuse and neglect.

ISSUE TWO:    WAS THE EVIDENCE LEGALLY AND FACTUALLY
              SUFFICIENT TO SUPPORT THE TERMINATION OF
              APPELLANT'S PARENTAL RIGHTS UNDER
              §161.001(1)(D) & (E)

Applicable Legal Standard

The evidence pertaining to subsections (D) and (E) is interrelated because both focus on endangerment.  Therefore, for convenience, the endangerment

termination findings are addressed in one point of error. *In re J.T.G.*, 121 S.W.3d 117, 126 (Tex. App. - Ft. Worth 2003, no pet.)

Both subsections use the term "endanger." Endangerment is defined as "to expose to loss or injury; to jeopardize." Although "endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury. *Texas Dept. of Human Servs. v. Boyd*, 727 S.W. 2d 531, 533 (Tex. 1987)

To support a subsection (D) finding the evidence must show that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." §161.001(1)(D) To sustain a subsection (E) finding, the evidence must establish that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." §161.001(1)(E)

A subsection (D) inquiry focuses on the "child's living environment rather than the parent's conduct, though parental conduct is certainly relevant to the child's environment." *In re A.S.,* 261 S.W. 3d 76, 83 (Tex. App. - Houston [14th Dist.] 2008, writ denied) Living conditions that are merely "less than ideal" do not

27

support a finding under this section." *Boyd,* 727 S.W. 2d at 533  The relevant time period is before DFPS removes the child.  *In re J.R.,* 171 S.W.3d 558, 569 (Tex. App. - Houston [14th Dist.] 2005 no writ) The parent need not have certain knowledge that an actual injury is occurring but must at least be aware of the potential for danger to the child in such an environment and must have disregarded that risk.  *In re C.L.C.,* 119 S.W.3d 382, 392 (Tex. App. - Tyler 2003, no pet.)

Under subsection (E) the danger must arise solely by the parent's actions or failure to act.  The inquiry focuses on whether evidence exists that the child's physical or emotional well-being is endangered by parental conduct, including acts, omissions or failure to act.  *In re J.W,* 152 S.W. 3d 200, 205 (Tex. 2006)  A termination finding must be based on more than a single act or omission and requires a voluntary, deliberate and conscious course of conduct by the parent.  *In re J.T.G.,* 121 S.W.3d at 125

The cause of the endangerment must be the direct result of the parent's conduct alone and must be the result of a conscious course of conduct rather than a single act or omission. *In re A.S.* 261 S.W.3d at 83 Thus, the relevant inquiry is whether evidence exists that a parental course of conduct endangered the child's physical or emotional well-being.  *Jordan v. Dossey,* 325 S.W. 3d 700, 713 (Tex. App. – Houston [1st Dist.] 2010, pet. denied)  Evidence of a parent's past conduct,

28

including criminal history, may be relevant if it shows a conscious course of conduct occurring both before and after a child's birth. *Avery v. State,* 963 S.W.2d 550, 553 (Tex. App.—Houston [1st Dist.] 1997, no writ)

The Department bears the burden of producing evidence concerning the engendering conduct and establishing that it was part of a voluntary course of conduct that endangered the child's well-being. *In re E.N.C.*, 384 S.W.3d 796, 805 (Tex. 2012)

Relevant Evidence:

H.J.-A. testified she was present in the house when her son Jonathan was injured. She called the ambulance because he complained of hurting in the abdomen area. She later learned he died because "he was hit in the stomach." She never personally saw "any injury or any assault upon her son." (RR 1 p. 11-13)

Jonathan was three years old at the time. He lived with his mother, stepfather and two siblings in a one-bedroom apartment. The children slept in the bedroom and the parents in the den. Mother took care of the children while J.A.R.-E. worked. (RR 1 p.14-15) On or about November 4, 2012, HPD officers searched the apartment. They wrote in the probable cause affidavit; "Inside the residence, there was not much notable, except that the floor was mopped and the mop with bucket was nearby, and it appeared the floor had recently been cleaned."

29

(DFPS #16)

On the day before Jonathan died mother took all three children to the park. He fell and scratched his eye. She cleaned his eye and the children continued to play at the park the rest of the day. (RR 1 p. 15-16)

J.A.R.-E. admitted to "playfully hitting Jonathan in the stomach." to HPD investigator Chavez ("Chavez"). Mother told the HPD investigator and the DFPS caseworker that she saw her "boyfriend play boxing with [their] 3-year-old son" the Friday before Jonathan died. Specifically, she told Chavez she "was in another room and went to her son after hearing him cry." She asked J.A.R.-J. what happened and he said "he was play boxing with [Jonathan] and struck him in the abdomen." (DFPS #8; p. 5 & DFPS #16, probable cause affidavit) Later she testified that statement was not true. She felt pressured to say that because "at that very day when I was seeing my child dead, I didn't know what to say because [a detective] told me that if I didn't see anything I was going to be put in jail." (RR 1 p. 26)

Appellant never saw J.A.R.-E. being violent with the children or physically discipline Jonathan. She stated, "everything was normal" with Jonathan that day. That morning he was relaxed, laughing and playing with his siblings. They returned home for lunch. Jonathan ate a normal ration of fruit and rice. Mother

30

then bathed all three children and he did not show any pain or discomfort. They then watched a movie and later they "all ate normally." (RR 1 p. 22-24)

After dinner she brought them to the bedroom where they sleep. She did not notice any pain or discomfort with Jonathan. J.A.R.-E. came home around 9:00 pm when the children were sleeping. They stayed up until about 11:00 pm. When mother went to the bathroom at about 3:00 or 4:00. She checked on Jonathan who was awake and told her "he hurt here (indicating)." She then woke up J.A.R.-E and called the ambulance. The first person did not speak Spanish who had difficulty understanding her. About 15 or 16 minutes later the ambulance arrived. (RR 1 p. 24; L. 3-25 & p. 25)

J.A.R.-E. told a DFPS investigator he arrived home at about 8 pm; ate; took a showed and then checked on Jonathan because mother told him he fell at the park and hurt his head. He appeared to be "ok." He went to the bathroom at about 4 am and heard moaning. He opened the bedroom door; turned the light on and found K.M.-J. and Jonathan awake. Jonathan was holding his side and fell down. H.J.-A. called the ambulance. (DFPS #8, p. 4)

H.J.-A. has no criminal or CPS history. J.A.R.-E has no CPS history and his only prior conviction was in 2009 for the class B misdemeanor offense of driving while intoxicated.

31

The medical examiner who performed the autopsy, Dr. Phatak, told the HPD investigator that Jonathan died from blunt force trauma to the abdomen that perforated the intestine. This caused bile to leak into the body causing his death. Typically it "takes 48-72 hours before death results." The autopsy noted the "body is well-developed, well-nourished, male Hispanic toddler whose appearance is compatible with his . . . stated age." It goes on to note the contusion on his abdomen where the blunt force was applied causing the rupture of his intestine. There were also abrasions on the right side of his forehead; "curvilinear" abrasions to the right facial area; "sternoclavical junction;" and anterior distal right thigh. (DFPS #15)

Shannon Frost ("Frost"), a forensic nurse at TCH, told Lightfoot that Jonathan had bruising "behind his ears, looped bruises on his legs, and non-specific bruises on his back." She said the bruising on the face could be consistent with a fall but not the other bruises. Importantly, she also said she had "no other information about Jonathan or the source of the injuries." Mother told the DFPS investigator the bruises behind his ear might have been caused when he was playing with K.M.-J.; he was born with what appeared to be bruises on his back; the bruises on his legs were caused while playing. She stated neither she nor J.A.R.-E. ever spanked or hit any of the children. (DFPS #8 p. 3-4)

32

At trial mother again stated Jonathan was born "with purple marks back there." She also stated some bruises might have occurred when she left the children with a friend whose older children were playing with sticks.  (RR 1 p. 31)

On November 4, 2012 DFPS examined K.M.-J. and D.A.R.-J. and neither had "observable injuries." (DFPS #8, p. 5)

Analysis & Argument:

The evidence pertaining to mother's actions or omissions that endangered the children is insufficient to support the subsection (D) and (E) findings.

The children came into DFPS custody because J.A.R.-E. delivered a fatal blow to Jonathan's abdomen that caused his intestine to rupture.  He admitted to law enforcement hitting Jonathan while "play boxing."  At the time of trial he was charged with causing the child's death.  The autopsy report confirms his blow caused the child's death.

H.A.-J. gave patently inconsistent statements as to whether or not she saw J.A.R.E. play boxing with Jonathan.  She initially claimed she was in the kitchen when she heard him crying.  When she asked J.A.R.-E. what happened, he answered they were play boxing.  However, Mother consistently reported that after the incident Jonathan appeared to be fine.  The next day he was playing in the park and appeared to be normal until in the early morning hours after he went to sleep.

33

This comports with what Dr. Phakat told the police; i.e. the blunt force trauma caused bile from the intestines to leak into Jonathan's body, which "takes 48-72 hours before death results."

Appellant testified neither she nor J.A.R.-E. physically abused or assaulted any of the children. Moreover, she never saw him mistreat any of the children. Nor was there any admissible evidence that K.M.-J. or D.A.R.-J. were abused or neglected.[5] This was noted when they came into DFPS care. The police who inspected their home observed there was "not much notable." Again neither parent had CPS history. Mother had no criminal history and J.A.R.-E.'s only criminal conviction was for the class B misdemeanor offense of driving while intoxicated in 2013. Finally, there is no evidence of drug abuse or domestic violence between H.A.-J. and J.A.R.-E.

Thus far the evidence does not establish that mother was engaging in a conscious course of conduct that endangered her children. It does show that J.A.R.-E. struck Jonathan in the abdomen with such force that it result in his death. Nevertheless, there was no evidence she was aware that he was capable of inflicting such a horrific injury. In regard to subsection (D), there was virtually no

---

[5] Appellant recognizes that Dr. Louis' statement regarding K.M.J.'s ankle provides some evidence that she was medically neglected. Nevertheless, for the reasons set forth under the first point of error that evidence should not have been admitted.

evidence regarding the children's living environment except when the police pointed out that there was "not much notable" in the condition of their home.

Mother concedes there is some evidence, albeit slight and underdeveloped, that shows Jonathan may have sustained other injuries. First, there is the Frost hearsay statement contained in the removal affidavit wherein she claims that Jonathan had bruising behind his ears, looped bruises on his legs, and non-specific bruises on his back. She had no other information about Jonathan or the source of the injuries. While she stated the bruising on his face could be consistent with a fall the other bruises could not have been caused in that way.

Secondly, the autopsy report noted in addition to the contusion on his abdomen, there were abrasions on the right side of his forehead as well as "curvilinear" abrasions to the right facial area, sternoclavical junction and anterior distal right thigh.

Mother explained the bruises behind his ear might have been caused when he was playing with K.M.-J.; he was born with what appeared to be bruises on his back and the bruises on his legs were caused while playing.

Frost and Dr. Phatak did not testify at trial. Frost concluded that the fall may have caused the bruises on Jonathan's face but could not have caused the other bruises. She specifically told Lightfoot she had no "other information about

35

Jonathan or the source of the injuries." Thus while she observed other bruises on Jonathan she could offer no theory as to what caused the bruise.[6] Mother's explanation of how those bruises may have occurred was not challenged.

Dr. Phatak noted "curvilinear" bruising on the right facial area, sternoclavical junction and anterior distal right thigh. The term "curvilinear" is never defined in the record. The Merriam Webster dictionary defines it as "consisting of or bounded by curved lines." Thus, the definition may encompass the term "looped" but it can certainly encompass other type of lines. Significantly, the autopsy report noted that the "curvilinear" bruises were not confined to the back of the right leg but were also found on the face and sernoclavical junction. So whereas Frost distinguished the bruises to the back of the leg from the other contusions, the autopsy report does not. In short, there is no evidence as to how or when the bruising occurred or when, if ever, mother became aware that someone, presumably J.A.R.-E., was causing the bruising.

In conclusion, this record contains scant evidence that appellant knew or should have known that J.A.R.-E. was capable of striking Jonathan with such force that it would cause his death. The evidence that shows mother engaged in a

---

[6] DFPS investigator Amato told appellant "the bruises on Jonathan's legs were looped and appeared to be caused by a belt or a cord." Yet the source of his information was never revealed. (DFPS #8, p. 4)

continuing course of endangering conduct is, at best, speculative.  It consists primarily of the bruising to Jonathan's body.  However, the source of these injuries is unknown.  Involuntary termination statutes are construed strictly in the favor of the parent and DFPS is required to "support its allegations against [appellant] by clear and convincing evidence; conjecture is not enough." *In re E.N.C.*, 384 S.W.3d at 802, 8110 (Tex. 2012) Therefore, based on the speculative nature of the scant evidence pertaining to the endangerment findings, appellant's second point of error should be sustained.

ISSUE THREE:   WAS THE EVIDENCE LEGALLY AND  FACTUALLY
            SUFFICIENT TO SUPPORT THE BEST INTEREST
            TERMINATION FINDING

Applicable Legal Standard

DFPS must prove by clear and convincing evidence that termination of appellant's parental rights is in the child's best interest. §161.001(2)

There is a strong presumption that the child's best interest is served by keeping the child with the natural parent.  *In re R.R.*, 209 S.W. 3d 112, 116 (Tex. 2006)  Termination of the parent-child relationship is not justified when the evidence shows that a parent's failure to provide a more desirable degree of care and support of the child is due solely to misfortune or the lack of intelligence or training, and not to indifference or malice  *Clark v. Dearen*, 715 S.W.2d 364, 367

37

(Tex. App. – Houston [1st Dist.] 1986, no writ) The same evidence may be probative of both §161.001(1) grounds and best interest. *In re C.H.*, 89 S.W.3d at 27

In *Holley v. Adams,* 544 S.W. 2d 367 (Tex. 1976), the court identified nine nonexclusive factors to consider in determining whether termination of parental rights is in a child's best interest. Those factors are: (1) the desires of the child; (2) the child's emotional and physical needs now and in the future; (3) any emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist those individuals seeking custody to promote the best interests of the child; (6) the plans for the child by the parties seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate that the existing parent-child relationship is improper one; and (9) any excuses for the parent's acts or omissions.

The *Holly* factors are not exhaustive. The absence of evidence pertaining to some of the factors will not preclude a termination finding on best interest grounds. However, scant evidence relevant to each *Holly* factor will not support such a finding. *In re C.H.,* 89 S.W.3d at 27 (Tex. 2002) A lack of evidence pertaining to one of the factors cannot be used as if it were evidence supporting a termination

finding. *In re E.N.C.* 384 S.W.3d at 809 (Tex. 2012) The appellate court reviews the entire record in deciding a challenge to the court's best interest finding. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013)

In cases where a governmental agency is the petitioner §263.307(a) states "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." §263.307(b) provides a list of factors to consider in determining whether a parent is willing to provide the child with a safe environment. *In re G.M.G.*, 444 S.W.3d 46, 55 (Tex. App. – Houston [14th Dist.] 2014, no pet.)

Analysis & Argument

When all the evidence is considered in light of the *Holly* and §263.307(b) factors it is clear that no rational trier of fact could have formed a strong conviction or belief that severing the mother-child bond was in the children's best interest. An analysis of the evidence pertaining to each relevant factor is discussed below.

<u>Children's Desires</u>:

At the time of trial K.M.-J. was four and D.A.R.-J. was two. Archield tried to learn what K.M.-J. desired but the child only spoke Spanish and "she's kind of all over the place as far as not really responding." She did not speak to anyone at DFPS to learn what the children might have told them regarding their desires. It is

39

unclear if D.A.R.-J. was able to express his feelings. See *In re A.C.*, 394 S.W.3d 633, 643 (Tex. App. – Houston [1ˢᵗ Dist.] 2012, no pet.)("The young age of the child rendered consideration of the child's desires neutral.")

Nevertheless, the evidence was undisputed that H.J.-A. loves her children and only missed two visits because she lacked taxi money. Archield observed her interact with them and agreed they are well bonded and love each other. In that area, mother is meeting their "physical and emotional needs." On the other hand, there was no evidence that the children were bonded to any other adult, such as a foster parent. See *Yonko v. DFPS*, 196 S.W.3d 236, 245 (Tex. App. – Houston [1ˢᵗ Dist. 2006, no pet.)("We agree that the child's desire to remain with a parent is only one factor to consider among many, but the love for a parent cannot be ignored as a reflection of the parent's ability to provide for the child's emotional needs. Where the evidence of the parent's failures is not overwhelming, the desires of the child weigh against termination of parental rights.")

Permanency:

Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. §263.307(a) *In re A.A.A.*, 265 S.W.3d 507, 517 (Tex. App. – Houston [1ˢᵗ Dist.] 2008, pet. denied)("the goal of establishing a stable, permanent home for a child is a compelling state interest")

40

On this factor the evidence also weighs against termination of the mother's rights. Archield testified the foster home is not willing to adopt the children. At the time of trial the children had been in DFPS custody for almost two years and no prospective adoptive family had yet been located. This situation exists despite her opinion that they are adoptable and a "legal broadcast" having already been done.

In fact, Archield agreed that "there's been no permanency on these kids" and if mother's rights are terminate "[w]e don't know where these kids are gonna end up."

Compliance with the FSP:

The trial court may properly consider a parent's compliance with the FSP as a factor in making its best interest determination. *In re E.C.R.*, 402 S.W.3d at 249 ("many of the factors supporting termination under subsection O also support the trial court's best interest finding.") Archield testified mother completed all the requirements of her FSP.[7] She also stated the purpose of the FSP is "to try to cure all the risks" that caused the child to be brought into care and eliminate future risk. She declined to opine on whether mother would be "a future risk to the children" because "she ain't been around long enough." (RR 2 p. 21-22) Nevertheless, she

---

[7] Although appellant's therapist told Archield on the day of trial she wanted her to attend more sessions, she did not only because DFPS failed to provide the required "2054's."

41

agreed H.A.-J. "wants these kids back with her" and "she's done everything to have that goal accomplished."

Children's Present & Future Needs:

Archield testified the children are in a foster home that is meeting all their physical and emotional needs. Yet she also stated K.M.-J. "hears voices and a baby crying continuously in her head." At the end of August "a psychological" was done but the results were still pending at the time of trial.

Parental Abilities of The Persons Seeking Custody:

Appellant was the only individual seeking custody. Archield agreed mother is employed and has a home which she has not seen the home. Most importantly, she further agreed mother "wants these kids back with her" and "she's done everything to have that goal accomplished."

Other Factors:

Although Archield did not review the medical records or have first hand knowledge of "the facts of removal," she believes H.J.-A. endangered the children based on what she heard. Similarly, DFPS had a primary goal of relative adoption and concurrent goal of reunification with the mother as late as October 2013. Even though nothing had "factually" changed since that date the goal was changed to termination.

Appellant has no CPS or criminal history. It is undisputed that J.A.R.-E. caused Jonathan's death. While there was bruising on the child's body the source of those injuries was never revealed. There was no evidence that H.A.-J. was aware of J.A.R.-E.'s ability to inflict such a devastating injury or that she coul have prevented it.

Conclusion:

The children came into care because J.A.R.-E. fatally injured Jonathan. At the time of trial, he was incarcerated in the Harris County jail for that offense. Thus, the person whose conduct clearly endangered the children is no longer a threat.

It is undisputed that mother and her children are bonded and love each other. She has done everything possible to be reunited with them; including completing all of the services on her FSP. Importantly, after two years, DFPS has been unable to find permanency for them. While Archield concluded the children have no special needs, the fact that K.M.-J. hears voices, cannot focus and required a full psychological evaluation at four years of age indicates she is not faring well in foster care.

Finally, when all the evidence pertaining to the best interest factors is weighed a rational fact finder could not conclude that terminating mother's

parental rights is in the children's best interest.  Therefore, the termination finding

on best interest grounds should be reversed.

PRAYER

Appellant, H.J.-A., prays that the Court reverse the trial court's judgment

terminating her parental rights.  Appellant further prays for general relief.

Respectfully submitted,

/s/ William M. Thursland

_____

William M. Thursland
TBN: 20016200
440 Louisiana St., Ste. 1130
Houston, Texas 77002
(713) 655-0200; Fax: (713) 655-9035
Email: wmthursland@hotmail.com

Attorney for Appellant, H.J.-A.

CERTIFICATE OF COMPLIANCE

I certify that the foregoing computer generated brief complies with word

limit requirements of TRAP 9.4 (3).  Relying on the word count of the computer

program used to prepare this document, the number of words, is 9,614 excluding the

caption, identify of parties and counsel, table of contents, index of authorities,

statement of the case, statement of issues presented, statement of procedural history,

44

signature, proof of service, certificate of compliance and appendix.

/s/ william m thursland

_____
William M. Thursland

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of appellant's brief was served in accordance with TRAP on June 2, 2015 to Sandra D. Hachem, Sr. assistant Harris County attorney, 1019 Congress, 16th Fl., Houston, TX 77002, by electronic delivery.

/s/ William. M. Thursland

_____
William M. Thursland